CHARLES E. CANTER (Cal. Bar No. 263197)
Email: canterc@sec.gov
DOHOANG T. DUONG (Cal. Bar No. 219127)
Email: duongdo@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Gary Y. Leung, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>JMJ CAPITAL GROUP and RICHARD LEE RAMIREZ,<br><br>　　　　Defendants. | Case No. **'22CV1481 DMS MDD**<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## SUMMARY

1. This action involves a securities fraud scheme perpetrated by Richard Lee Ramirez ("Ramirez") through his company JMJ Capital Group ("JMJ Capital"). For at least two and a half years, from March 2019 to August 2021, Ramirez raised at least $5.8 million from dozens of investors, falsely promising monthly and bi-monthly returns as high as 25 and 30 percent to invest various business lines. To some investors, Ramirez claimed funds would be used to finance accounts receivable of other business. To other investors, Ramirez represented that investor funds would be used to import personal protective equipment, which was in short supply due to the Covid-19 pandemic. To yet other investors, Ramirez claimed that JMJ Capital had been contracted to rebuild air conditioning systems for a major cruise line. In fact, JMJ Capital was a sham that conducted almost no legitimate business. During the course of his fraud, Ramirez provided investors with fake account statements that reflected fake returns that JMJ Capital had not actually earned from investments JMJ Capital had not actually made. Instead, Ramirez spent investor funds on his own lavish lifestyle and to make Ponzi-like payments to investors.

## JURISDICTION AND VENUE

2. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

3. Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

4. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because Defendant JMJ Capital has its principal place of business in this district.

## DEFENDANTS

5. **JMJ Capital** is a California corporation with its principal place of business in Solana Beach, California.

6. **Ramirez**, age 53, is the Chief Executive Officer, Secretary, and Chief Financial Officer of JMJ Capital. He is not registered with the Commission in any capacity. His last known residence was in Carlsbad, California.

## THE ALLEGATIONS

7. Ramirez formed JMJ Capital in late 2018.

8. Since forming JMJ Capital, Ramirez has exercised control over JMJ Capital and has been the sole signatory on JMJ Capital's bank accounts.

9. Through at least April 12, 2022, JMJ Capital has maintained a website which states that JMJ Capital engages in the business of "invoice factoring," which it described as follows:

> Invoice factoring is a form of financing that isn't dependant [*sic*] on banks or lengthy loan applications. It isn't really a loan at all. Instead a business (that's you) sells its outstanding invoices to a factoring company (that's us) in exchange for upfront cash.

10. From March 2019 to August 2021, Ramirez raised at least $5.8 million from about 47 investors to invest in JMJ Capital.

11. Ramirez often provided investors, via email, a document styled "Funding Partner Agreement" between the investor and JMJ CapiItal.

12. These Funding Partner Agreements set forth the amount initially invested and a rate of return that Ramirez promised the investor.

13. At Ramirez's request, investors provided funds to JMJ Capital via wire transfer.

14. Ramirez offered most investors returns between 12% and 22% for a 90-day capital investment.

15. Ramirez promised some investors returns of up to 30% for a one-month investment.

16. When soliciting investors and potential investors, Ramirez explained that investors could only lose money if the goods underlying the receivables JMJ Capital would purchase were lost in transit or a buyer for the goods could not be found.

17. Ramirez explained that after the initial 90-day investment period ended, investors could liquidate their investment and withdraw their capital, or reinvest all or a portion of it.

18. Most investors chose, at Ramirez's suggestion, to roll over their investments to earn more money.

19. Ramirez pooled JMJ Capital investors' money in a common enterprise.

20. The investors were passive and exercised no control over the operations of JMJ Capital and no discretion over how JMJ Capital allocated investor funds

21. Investors' expectation of profits from their investments were tied solely to the efforts of others, specifically JMJ Capital and Ramirez.

## The Fraud

22. Contrary to Ramirez's representations to investors, JMJ Capital engaged in almost no legitimate business and generated minimal, if any, profits after June 2019.

23. Ramirez personally represented to a potential investor in August 2019 that JMJ Capital made millions factoring accounts receivable.

24. Ramirez told this investor that an investment in JMJ Capital would return 12 percent per quarter and would be liquid.

25. On or about August 19, 2019, Ramirez sent to this investor a document styled "Funding Partner Agreement" between the investor and JMJ Capital.

26. The investor signed the Funding Partner Agreement and returned it to Ramirez, along with an investment of $100,000.

27. Ramirez's representations regarding the return on investment and the investment's liquidity were material.

28. Less than two weeks later, Ramirez approached this investor again and represented that an additional investment would yield an 18 percent return in 30 days.

29. In response to Ramirez's representations, the investor invested an additional $25,000 with JMJ Capital.

30. Ramirez told the investor that the August 19, 2019 Funding Partner Agreement was sufficient documentation of all transactions.

31. JMJ Capital made several interest payments to the investor, but when the investor sought return of $50,000 in capital in March 2020—more than six months after the purported short-term investment periods—JMJ Capital and Ramirez did not return any portion of the requested funds.

32. In fact, the extent of JMJ Capital's purported invoice factoring business consisted of two investments in receivables for an outdoor furniture company in Wisconsin: a March 7, 2019 investment in the amount of $300,000 and a March 14, 2019 investment in the amount of $200,000. The total income from these investments was $90,000.

33. JMJ Capital made no other invoice factoring investments after March 2019, and received no income from such investments after June 6, 2019.

34. Ramirez solicited investments from other investors by means of other false statements about JMJ Capital's business.

35. In May 2019, Ramirez falsely represented to an investor that JMJ Capital had been contracted to rebuild air conditioning systems for Disney Cruise Lines.

36. By mid-2020, Ramirez was telling investors that JMJ Capital was in the business of purchasing personal protective equipment ("PPE") from Asia for sale in the United States.

37. In November 2020, Ramirez claimed during an investor presentation that JMJ Capital had shifted its business model from providing financing for the purchase of patio furniture to focusing on the purchase of PPE from Asia.

38. During that pitch, Ramirez falsely represented that he had deals with large buyers, including federal agencies like the Department of Defense.

39. In fact, the extent of JMJ Capital's PPE business consisted of a single sale of gloves for $2,100 in August 2020.

40. By at least September 2019, JMJ Capital's payments to investors were Ponzi-like returns in that they exceeded JMJ Capital's revenue from its purported invoice factoring and PPE businesses.

41. Between March 2019 and August 2021, Defendants raised at least $5.8 million from about 47 investors and paid approximately $2.5 million in Ponzi-like returns to about 33 investors, while generating less than $100,000 in profit and less than $600,000 in total revenue from operations.

42. During the same period, in addition to making Ponzi-like payments to investors, Ramirez misappropriated at least $800,000 of investor funds for his personal use.

43. A review of JMJ Capital's March 2021 banking activity illustrates the fraudulent scheme.

   (a) Ramirez gave one investor a check for $100,000 and asked him not to deposit it until March 3, 2021.

(b) When the investor attempted to deposit that check on March 4, 2021, it was returned unpaid due to insufficient funds.

(c) Notwithstanding that shortfall, Ramirez promised a 20% return ($40,000) in 60 days to a second investor who made two capital contributions of $100,000 on March 9 and 10, 2021.

(d) In the days following those two $100,000 investments, Ramirez wired $120,000 to a third investor and transferred $62,000 to his personal accounts.

(e) He also spent more than $11,000 at Jets.com, $6,000 at the Whitby Hotel in New York, $7,000 at the Fairmont Hotel in Scottsdale, Arizona, and $13,600 at high-end retailers like Elie Saab, Bergdorf Goodman, and Oscar de la Renta.

(f) Despite $200,000 in new capital, JMJ Capital had a -$4,963.72 bank account balance by the end of March 2021.

(g) JMJ Capital conducted no legitimate business and had no revenue during March 2021.

44. In addition to making Ponzi-like payments to some investors, Ramirez provided investors with fake account statements that purportedly reflected investments in receivables along with purported returns that JMJ Capital had earned.

45. For example, one investor invested $10,000 on or about November 7, 2020, after Ramirez had promised a 30 percent return in one month.

46. The investor decided to reinvest his purported returns.

47. Ramirez and JMJ Capital provided the investor with monthly account statements dated December 6, 2020, January 6, 2021, February 6, 2021, March 6, 2021, April 6, 2021, and May 6, 2021.

48. Each statement reflected an increased account value, a new "Purchased Receivable," a return equal to 30 percent of the account value, and a "total," which

was the sum of the account value and the return. That total was the purported account value for the following month.

49. According to the May 6, 2021 statement, the investor's initial $10,000 investment on November 6, 2020, had purportedly grown to $59,406.88 in five months.

50. In fact, JMJ Capital purchased no receivables between November 2020 and May 2021.

51. When the investor asked to withdraw his capital and close his account on June 2, 2021, Ramirez emailed the investor stating, "congrats on great returns and of course you can cash out your [$]77,228.94."

52. On June 5, 2021, Ramirez emailed the investor stating that the funds had been wired to the investor's bank account and would be available on Monday, June 7, 2021.

53. Instead, after the investor had threatened to hire a lawyer, Ramirez paid the investor $20,000 with two checks for $10,000 each in June 2021, and paid another $10,000 to the investor with a third check for $10,000 in August 2021.

54. Ramirez gave the investor a fourth check dated August 4, 2021, but the written amount differed from the numeric amount, and the investor's bank would not honor the check.

55. The payments to the investor were Ponzi-like payments from other investors' funds and not from revenues generated by investing in receivables.

56. Wells Fargo closed JMJ Capital's bank accounts in late 2021. One account, closed in October 2021, had a balance of $9,050.23, and the other, closed in December 2021, had a balance of -$90,750.

# FIRST CLAIM FOR RELIEF

## Fraud in the Offer or Sale of Securities

## Violations of Section 17(a) of the Securities Act

### (Against All Defendants)

57. The SEC realleges and incorporates by reference paragraphs 1 through 56 above.

58. In the offer or sale of securities, Defendants misled and deceived investors and prospective investors by misleading investors about the liquidity of their investments, JMJ Capital's business and profitability, and the use of investor funds to pay Ramirez and Ponzi-like investor returns.

59. In addition, Defendants engaged in a scheme to defraud whereby they defrauded investors by making and/or disseminating false and misleading statements, misused investor funds by using them to pay Ramirez and Ponzi-like investor returns.

60. By engaging in the conduct described above, Defendants, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

61. Defendants, with scienter, employed devices, schemes, or artifices to defraud; and Defendants, with scienter or negligence, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and Defendants, with scienter or negligence,

engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

62. JMJ Capital acted entirely through Ramirez. Therefore, his knowledge, recklessness and/or negligence may be imputed to JMJ Capital.

63. By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Sections 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SECOND CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(Against All Defendants)**

64. The SEC realleges and incorporates by reference paragraphs 1 through 56 above.

65. In connection with the purchase or sale of securities, Defendants misled and deceived investors and prospective investors about the liquidity of their investments, JMJ Capital's business and profitability, and the use of investor funds.

66. In addition, Defendants engaged in a scheme to defraud whereby they defrauded investors by making and/or disseminating false and misleading statements, misused investor funds by using them to pay Ramirez and to pay Ponzi-like returns to investors.

67. Because Ramirez, as sole manager of JMJ Capital, directly and indirectly controlled the entity and exercised day-to-day control over the entity, he is maker of these statements to investors, along with the entity.

68. By engaging in the conduct described above, Defendants, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, employed devices, schemes, or artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading; and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

69. Defendants, with scienter, employed devices, schemes, or artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities by the conduct described in detail above.

70. By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### THIRD CLAIM FOR RELIEF

**Unregistered Offer and Sale of Securities**

**Violations of Sections 5(a) and 5(c) of the Securities Act**

**(Against All Defendants)**

71. The SEC realleges and incorporates by reference paragraphs 1 through 56 above.

72. The JMJ Capital offering involved the offering of securities in the form of investment contracts.

73. The JMJ Capital offering was not registered with the SEC.

74. Defendant JMJ Capital, as the issuer of the securities, directly offered and sold securities in the form investment contracts.

75. Defendant Ramirez, directly and indirectly offered and sold the JMJ Capital securities, and was a necessary participant and substantial factor in JMJ Capital's offering and the sale of securities because, among other things, he controlled JMJ Capital, was its only manager, made presentations to and

communicated directly with investors about the securities and the merits of investing with JMJ Capital, received proceeds from the offering.

76. Investors in JMJ Capital were located in multiple states and Defendants conducted the offering by mail, text message, and electronic wire transfers.

77. By virtue of the foregoing, (a) without a registration statement in effect as to that security, Defendants, directly and indirectly, made use of the means and instruments of transportation or communications in interstate commerce and of the mails to sell securities, and (b) made use of the means and instruments of transportation or communication in interstate commerce and of the mails to offer to sell securities as to which no registration statement had been filed.

78. By reason of the foregoing, Defendants directly or indirectly violated, and unless restrained and enjoined, will continue to violate, Section 5 of the Securities Act, 15 U.S.C. § 77e.

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

**I.**

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

**II.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

**III.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c)].

**IV.**

Issue an order permanently enjoining Ramirez from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security in an unregistered offering by an issuer; provided, however, that such injunction shall not prevent Ramirez from purchasing or selling securities for his own personal account.

**V.**

Issue an order, pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Sections 2l(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), prohibiting Ramirez from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78ℓ, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).

**VI.**

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7), 15 U.S.C. §§ 78u(d)(5) and 78u(d)(7).

**VII.**

Order Defendants to pay civil penalties under Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d).

## VIII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## IX.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  September 30, 2022

*/s/ Charles E. Canter*
Charles E. Canter
Dohoang T. Duong
Attorneys for Plaintiff
Securities and Exchange Commission